J-A15032-20
J-A15033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO: S.P.M., JR, A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.E.M., MOTHER | : : : | |
| | : | No. 573 EDA 2020 |

Appeal from the Decree Entered January 13, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0029

*****

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO: M.C.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.E.M., MOTHER | : : : | |
| | : | No. 574 EDA 2020 |

Appeal from the Decree Entered January 13, 2020
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0030

*****

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO: S.P.M., JR, A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.P.M., SR., FATHER | : : : | |
| | : | No. 575 EDA 2020 |

J-A15032-20
J-A15033-20

Appeal from the Decree Entered January 13, 2019
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0029

*****

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO: M.C.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.P.M., SR., FATHER | : : : : : | |
| | : | No. 576 EDA 2020 |

Appeal from the Decree Entered January 13, 2019
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
No. A2019-0030

BEFORE:   LAZARUS, J., KING, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 24, 2020**

M.E.M. (Mother) and S.P.M., Sr., (Father) (collectively, Parents) appeal from the decrees, entered in the Court of Common Pleas of Lehigh County, involuntarily terminating their parental rights to their minor children, S.P.M., Jr., (born 03/06) and M.C.M. (born 02/07) (collectively, Children).[1]  Upon careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] By filing four separate notices of appeal with one docket number on each notice, Parents have complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), which held that "where a single order resolves issues arising on more than one docket, separate notices of appeal

- 2 -

Parents have an extensive history with the Lehigh County Office of Children and Youth Services (CYS). Prior to August of 2015, CYS received fourteen referrals based on a range of persistent concerns including truancy, medical neglect, domestic violence, and inadequate housing. N.T. Termination Hearing, 11/21/19, at 8. The fifteenth referral was made in August of 2015, after a vehicle struck M.C.M., then eight years old, while he was riding his scooter unsupervised; M.C.M. sustained a concussion, abrasions, and a collapsed lung. *Id.* On August 27, 2015, Children and their four siblings were adjudicated dependent. M.C.M. was placed with his maternal grandparents, while S.P.M., Jr., and his four other siblings were permitted to remain with Parents pursuant to a protective order. *Id.* at 10-11. Parents were ordered to cooperate with CYS and permit weekly access to the familial home, maintain a safe and sanitary home for the five children in their care, ensure that the children in their care attended school and medical appointments, and provide verification of legal sources of income. *Id.* Parents were further ordered to undergo mental health evaluations, to follow any and all recommendations from their mental health provider, and to have the children in their care receive medical examinations within thirty days. Order, 1/29/16.

---

must be filed for each of those cases." *See also* Pa.R.A.P. 341(a). We have consolidated the appeals *sua sponte* for ease of disposition. *See* Pa.R.A.P. 513 (consolidation of appeals).

On January 29, 2016, CYS took emergency custody of S.P.M., Jr., and the remaining children following disclosures that the oldest child was performing oral sex upon himself in front of his siblings.[2] N.T. Termination Hearing, 11/21/19, at 12-18. On February 1, 2016, following a shelter care hearing, the five children were removed from Parents' home and placed with M.C.M. at the home of their maternal grandparents. N.T. Termination Hearing, 11/21/19, at 12-19.

At the time of the permanency review hearing on February 29, 2016, Parents had failed to undergo mental health evaluations, enroll their children in school, and obtain medical examinations for their children as previously ordered. *Id.* at 15-17. Parents also failed to maintain safe and sanitary living conditions by piling "garbage bags . . . [o]nto the basement stairs" and ignoring an "abundance of cockroaches in the home;" water from the

---

[2] At a March 2016 permanency review hearing, Justice Works worker Linda Coleman testified that:

> she had been attempting to work with the family since [] January 2016 [], and that Justice Works had been referred to the family months before that time. . . . Ms. Coleman testified that when she [] visited the home on January 28, 2016, [Children's oldest sibling] reported to her that he could [self-fellate]. The other children confirmed that he could, as they had seen him do it.

Permanency Review Order, 3/9/16, at 7-8. She further testified that "when it was brought up to [Mother] that the oldest sibling was performing oral sex on himself[,] [Mother said] she knew about [i]t, and she [had used it] as a teaching experience for her children. . . . She never reported it to the agency or any providers working with the family." N.T. Termination Hearing, 11/21/19, at 47-48.

bathroom leaked into the kitchen as well. *Id.* at 58; Permanency Review Order, 3/9/16, Ex. P1A-13, at 8.[3] Mother had been minimally cooperative with in-home services provided by Justice Works, and Father did not comply with them whatsoever. N.T. Termination Hearing, 11/21/19, at 17.

By May 23, 2016, Children and their siblings were reportedly doing well in the home of their maternal grandparents and were all enrolled in school; M.C.M., however, had to re-adjust to living with his five siblings. *See* Permanency Review Order, 6/10/16, Ex. P1A-27, at 7; Permanency Review Order, 6/10/16, Ex. P1B-21, at 7.[4] In June of 2016, maternal grandparents disclosed that at least three of the children were engaging in sexual activity with one another. N.T. Termination Hearing, 11/21/19, at 22; *see also* Child Welfare Information Solution (CWIS) Referral Intake History, 4/4/18, Ex. P2-5, P2-8. All children were removed from the maternal grandparents' home and placed in foster care, where M.C.M. struggled to adjust. N.T. Termination Hearing, 11/21/19, at 22. Ultimately, M.C.M. returned to living with his maternal grandparents in August of 2016. He continues to live with them, and they are an adoptive resource for him. *Id.* at 22-23.

---

[3] Parents also rented a padlocked room on the third floor of the home to an unidentified male, about whom they were "never forthcoming." N.T. Termination Hearing, 11/21/19, at 58.

[4] During this review period, Child Protective Services (CPS) launched an investigation into Parents based on disclosures from their children that Parents would physically beat them using their hands, a belt, or a wooden paddle, under the guise of parental discipline. Permanency Review Order, 6/10/16, Ex. P1A-27, at 7.

At the permanency review hearing on August 22, 2016, the court found Parents minimally-to-non-compliant with their permanency and reunification goals. Specifically, Father failed to undergo the protective parenting treatment recommended to him after his psychological evaluation. Permanency Review Order, 9/20/16, Ex. P1B-35. Although Mother began protective parenting treatment at Forensic Treatment Services (FTS), she "remain[ed] resistant to [such] treatment and [did] not fully understand why the children were removed from her care." Permanency Review Order, 9/20/16, Ex. P1A-45. Maternal grandparents, in contrast, were communicative and cooperative with CYS and participated in protective parenting treatment at FTS. *See id.* at Ex. P1A-29, P1A-35; Permanency Review Order, 9/20/16, Ex. P1B-29, P1B-35.

In January of 2017, after Children and their siblings started disclosing, in therapy, the extent of the sexual abuse and behavior between them in the past, the court suspended all visitation between Parents and their children, and between all of the children, per their therapists' recommendations. Order, 1/20/17.[5] At permanency review hearings held on February 13, 2017, May 15, 2017, and August 14, 2017, Father was deemed minimally compliant with his reunification goals, and Mother was deemed moderately to minimally

_____

[5] "Parents [] entered into this [s]tipuation not because they wish[ed] to stop contact with their children, but rather because they underst[oo]d that the therapists [] recommend[ed] this course of action as being in [the] best interests [of the children]." Order, 1/20/17, at ¶ 6. Parents' daughters, A.Q.M. and A.A.M., were permitted to continue living together. *Id.* at ¶ 1.

complaint with hers. *See* N.T. Termination Hearing, 11/21/19, at 25-35. By May 15, 2017, Mother had been unsuccessfully discharged from protective parenting treatment at FTS due in part to her "aggressive attitude." Permanency Review Order, 6/8/17, Ex. P1A-53. Father was unsuccessfully discharged as well. *Id.* By February of 2018, Parents had been unsuccessfully discharged from protective parenting treatment with a second service provider, PA Forensics. Permanency Review Order, 3/20/18, Ex. P1A-71. Parents made no attempts to re-enroll in any protective parenting treatment. N.T. Termination Hearing, 11/21/19, at 36.

Furthermore, by February of 2018, after Children and their siblings revealed more disturbing information during therapy, CPS received a new referral naming Parents as perpetrators of sexual abuse based on their failure to curtail the rampant sexual activity amongst their children. *Id.* Following an investigation, Children's oldest sibling, S.M., was indicated as a perpetrator of sexual abuse, based in part on his own admissions to CPS that corroborated his siblings' accounts of abuse and exploitation. *See* CWIS Intake Referral, 4/4/18, Ex. P2, at 5-8. S.P.M., Jr., disclosed to CPS that Parents were "aware of all the sex stuff going on" between the children—some of which occurred after witnessing Parents have sex; S.M. confirmed the same. *Id.* at 8. Parents explained to CPS that "they were aware of inappropriate sexual behaviors with the children[,] but did not specify what those behaviors were." *Id.* Ultimately, Parents both received "Indicated" statuses as perpetrators of sexual abuse through omission. *Id.* As a result, Mother's employment was

terminated, and Parents relocated to Tamaqua following their eviction for non-payment of rent.  N.T. Termination Hearing, 11/21/19, at 41-42.  The court placed the responsibility on Parents to locate protective parenting service providers in that area after CYS was unable to do so.  When Mother indicated to CYS that transportation was an issue, CYS emailed Parents asking them to identify their service provider so that CYS could facilitate transportation.  Parents did not respond to CYS and did not reengage in protective parenting services.  *Id.* at 76-79.

At a permanency review hearing on August 6, 2018, the court found Parents were minimally compliant with their reunification goals.  Permanency Review Order, 9/17/18, Ex. P1A-73.[6]  At permanency review hearings held on October 29, 2018, December 19, 2018, April 29, 2019, and October 21, 2019, however, they were deemed noncompliant.  *See* Permanency Review Order, 11/6/19, Ex. P1B-100; Permanency Review Order, 11/6/19, Ex. P1A-100; Permanency Review Order, 5/29/19, Ex. P1B-91; Permanency Review Order, 5/29/19, Ex. P1A-91; Permanency Review Order, 12/19/18, Ex. P1B-82; Permanency Review Order, 11/20/18, Ex. P1A-82.  CYS filed petitions to involuntarily terminate Parents' rights to Children on April 30, 2019.

---

[6] At the time of the August 2018 hearing, CYS was ordered to have Children undergo evaluations to determine whether termination of Parents' parental rights would serve their best interests.  N.T. Termination Hearing, 11/21/19, at 44-45.

On November 21-22, 2019, the trial court held termination hearings at which the following individuals testified: Jennifer Sell, CYS caseworker; Laura Craig, CYS caseworker; Dr. Bradley Beckwith, S.P.M., Jr.'s psychologist; Toby Nicolosi, Father's forensic counselor at FTS; and Vickie Moyer, Mother's therapist at FTS.[7] The court also held two *in camera* conversations with Children. Following the hearing, the court entered decrees terminating Parents' parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[8]

Mother and Father each filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal.[9] They raise the following issues for our review:

1. Did the trial court commit an error of law or abuse of discretion in its determination that [CYS] sustained its burden of proof by clear and convincing evidence that the statutory standards set

---

[7] Attorney David Crosson represented S.P.M., Jr., and Attorney Kathryn Williams represented M.C.M at the termination hearings. At the start of the hearing on the 21st, the trial judge indicated that neither attorney was "representing a conflict position." **See** N.T. Termination Hearing, 11/21/19, at 4. **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc), **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian ad litem representing the child's best interests can also represent the child's legal interests.").

[8] 23 Pa.C.S.A. §§ 2101-2938.

[9] **See** Pa.R.A.P. 1925(a)(2) (in children's fast track cases, concise statement shall be filed and served with notice of appeal).

forth in 23 Pa.C.S. §§ 2511(a)(1), (2), (5)[,] and (8) had been met?[10]

2. Did the trial court commit an error of law or abuse of discretion in its determination that [CYS] sustained its burden of proof by clear and convincing evidence that the termination of [Father's] parental rights best meets the developmental, physical[,] and emotional needs and welfare of the children as required by 23 Pa.C.S. §§ 2511(b)?

3. Did the trial court err as a matter of law and/or abuse [its] discretion in finding that [CYS] sustained [its] burden of proof by clear and convincing evidence that the termination of [Mother's] parental rights to [S.P.M., Jr., and M.C.M.][11] best meet the needs and welfare of the children as required by 23 Pa.C.S. §§ 2511(b)?

Brief of Father, at 5; Brief of Mother, at 4.

Our standard of review in cases involving the termination of parental

rights is well-settled:

[It] requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

_____

[10] This issue, included in Father's appellate brief, appears almost verbatim in Mother's appellate brief. **See** Brief of Mother, at 4 ("Did the trial court err as a matter of law and/or abuse [its] discretion in finding that [CYS] met the requirements of 23 Pa.C.S. §§ 2511(a)(1), (2), (5)[,] and (8) by clear and convincing evidence?"). We address them together to avoid redundancy.

[11] Counsel for Mother erroneously named A.Q.M. and A.A.M. in place of S.P.M., Jr., and M.C.M. in his statement of questions involved. Neither A.Q.M. nor A.A.M. is discussed throughout the remainder of Mother's appellate brief. The trial court previously terminated Parents' rights to their minor daughters, A.Q.M. and A.A.M., after a hearing on August 3, 2018. This Court affirmed that decision on October 24, 2019. **See In re A.Q.M. and A.A.M.**, 194 EDA 2019 (Pa. Super., filed Oct. 24, 2019) (unpublished memorandum). It is not the subject of the current appeal.

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision [] should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

At the termination hearing, CYS Caseworkers Craig and Snell testified that Mother and Father have consistently failed to complete even a single court-ordered service to effectuate reunification with Children, whether it be verifying mental health treatment, maintaining a safe and sanitary home, ensuring Children attend school, obtaining medical examinations for Children, complying with reunification and in-home services deemed necessary by CYS, following through with the recommendations resulting from mental health evaluations, or most importantly, completing protective parenting treatment. *See* N.T. Termination Hearing, 11/20/19, at 11-46, 63-83. With regard to protective parenting treatment, both Mother and Father were discharged unsuccessfully from two separate service providers, and have made no efforts to reengage. *Id.* at 30-36.

Additionally, at the termination hearing, Moyer and Nicolosi testified regarding the inability of Mother and Father, respectively, to appreciate the seriousness of the sexual behavior and abuse that had occurred amongst their children, the impact it has had on their children, or their own roles in allowing it to continue. Moyer testified that she attempted to work with Mother "to identify the lack of boundaries in the home, the means of discipline that [were]

used with her children, and the sexually aggressive behavior that was taking place in the home between the children." N.T. Termination Hearing, 11/22/19, at 46-67. Mother remained "extremely defensive . . . and irritated," and "refused to identify her role as a parent." *Id.* at 49. Moyer further testified that if a parent is unable to accept the reality of the "horror [that] has happened in the family," there is a poor chance any of the problems will be solved, and Children will remain unsafe. *Id.* at 51-52. In the end, Mother "didn't make any progress" in her protective parenting treatment; "she didn't think there was anything wrong with the way her family functioned, and therefore did not see that it had an impact on the children at all." *Id.* at 54.

Similarly, Nicolosi testified that Father consistently refused to take any responsibility for Children's circumstances, nor did he acknowledge his own need for treatment in order to safely parent his children. *Id.* at 7-13. Over the course of his short-lived treatment, Father disclosed that he was "verbally and physically aggressive in the home" as a means of discipline, detailing at least one incident in which he grabbed his children by the neck, and explained that he "do[es]n't have any goals" in terms of protective parenting treatment or in life. *Id.* at 8, 21-23. Doctor Beckwith also testified as to Father's absentee parenting style and emphatic denial of the sexual behavior occurring among the children. N.T. Termination Hearing, 11/21/19, at 120. Doctor Beckwith explained that Father admittedly spent the majority of his time isolated in the basement or other areas of the home, trying to avoid his children while Mother cared for them and for him. *Id.* at 120-22. Based on

the results of psychological tests, Father was deemed to have a paranoid and

passive aggressive personality. Doctor Beckwith further testified that

> [These personality traits are] not dissimilar. In fact, they have quite a significant amount of overlap in their symptoms. [I]ndividuals with these personality traits believe that the world is out to get them. They are resentful towards others . . . [and] have a limited capacity [for] understanding people. They can't empathize effectively. So to connect with a child, you have to at least understand what they're going through. You have to understand how to meet their basic needs, whether it be food, shelter, cleanliness, or even what it would be like for them to go to bed hungry. . . . These individuals are going to struggle [to understand] how [anything] would be perceived by the children.[12]
>
> These individuals don't think they do anything wrong. . . . They have an egocentric perception, which means it's all about them. Every situation they consider their needs first[.]
>
> * * *
>
> [I]n this case[,] what we know about [Father] is that his way of coping with those within his household is to isolate and avoid. So that is particularly dangerous with the sexually acting out behaviors, because if the children are being sexually aggressive towards each other and the parents leave the situation, they are in a way allowing that to continue. They are permitting it to continue, which is how the children get to see it, because they're essentially just walking away from the situation and not intervening.
>
> * * *
>
> I asked [Father] numerous times in different ways how his wife would be affected and how the children would be affected by his isolation and by all of his resentment and refusal to attend visits,

---

[12] As Dr. Beckwith explained, "[o]ne of the best indicators of positive child-rearing is the parent-child relationship. And somebody that cannot empathize with a child cannot establish a healthy relationship with that child." N.T. Termination Hearing, 11/21/19, at 152.

and he continued to shift the focus back to him and how . . . it wasn't fair to him.

*Id.* at 127-131.

Doctor Beckwith also opined on the impact on S.P.M., Jr., of terminating Parents' parental rights. Doctor Beckwith testified in great detail as to S.P.M, Jr.'s reports of maltreatment and abuse at the hands of his parents and siblings.[13] He further testified that although S.P.M., Jr., was initially against the idea of losing his parents, upon reflection, he was excited at the idea of finding true caretakers who will treat him kindly.[14] *Id.* at 140. It was Dr.

_____

[13] Doctor Beckwith testified, in part, as follows:

> [In t]he home itself, there was a normalization of head lice. . . . [A]ll the siblings would pass lice and back and forth to each other[.] . . . [S.P.M., Jr.,] had said that if you looked at the carpet long enough you could see it moving because of maggots and roaches that were underneath the carpet in the bedroom. He was fearful to walk on the floor barefoot. He often went to bed hungry. . . . He [also said] that there was quite of bit of sexualized behaviors between himself and his siblings as well. . . . He said that [Father] was almost never present, and when he was present, he would hit him . . . with a couple of different objects. He also said that his mother would [] hit him . . . [and that she] had two [] men that would visit her in the house quite a bit[.] . . . He talks about [his] frustration because these men would bring food into the house and would eat in front of [the children] and then [he] would not have anything to eat and would go to bed hungry. He described a very negligent supervision.

N.T. Termination Hearing, 11/21/19, at 136-39.

[14] Doctor Beckwith further testified:

> [S.P.M., Jr.,] said he's interested in having somebody adopt him and he talked about 'silly' things they could do together

Beckwith's professional opinion that S.P.M., Jr., does not have any significant, positive attachment to Mother and Father, and simply yearns for someone to call "mom" and "dad." *See id.* at 159. Doctor Beckwith testified that terminating Parents' parental rights would ultimately be beneficial for S.P.M., Jr., because it would allow him to form new, positive relationships.

> [S.P.M., Jr.,] has this fantasy perception of parents that he bases off of his descriptions from television shows from watching Nickelodeon, and that's what he thinks is going to happen. So as long as there is this [] anchor of his parents weighing him down and his belief about what they're capable of accomplishing, he can't really put the emotional effort into forming new relationships.

*Id.* at 147. Doctor Beckwith also explained that terminating Parents' parental rights would open S.P.M., Jr., up for adoption and give him a goal to work towards. *Id.* at 159.

Upon review of the record, we find there is ample, competent evidence to support the trial court's factual findings. *T.S.M.*, *supra*. Moreover, the court's conclusions are not a result of an error of law or an abuse of discretion. *Id.* Children were removed from Parents' care due to their negligent supervision and maltreatment. Since Children were adjudicated dependent, "[t]he court-ordered services have remained largely the same throughout

---

> like getting Chinese food [and] playing basketball. He asked me if his bus driver could be available to adopt him because his bus driver is very nice to him. . . . This is just – this is a kid that is really putting it out there that he wants somebody to care for him."

*Id.* at 140-42.

four-and-a-half years of dependency proceedings. Neither parent has completed even one court-ordered service." Final Decree, 1/13/20, at n.1. Parents have both failed to complete the protective parenting treatment that was necessary to effectuate reunification with Children, and evidenced their intentions not to seek such treatment. They are both demonstrably unwilling or unable to rectify the serious issues that led to Children being removed from their care in the first place. "After all this time, [P]arents are no closer to reunifying with [Children] than they were [] when [Children were] removed from their care." *Id.*[15] Accordingly, we find that the record supports the trial court's finding that termination was proper pursuant to section 2511(a)(2), where Parents demonstrated "continued incapacity, abuse, [and] neglect . . . causing [Children] to be without essential parental care, control or subsistence necessary for [their] physical or mental well-being[.]" 23 Pa.C.S. § 2511(a)(2).[16]

---

[15] The trial court provided nearly identical reasoning in each of four decrees, entered on the same date, terminating each parent's right to each child at issue.

[16] While the trial court found that CYS also met its burden of proof under subsections (a)(1), (5), and (8), "we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

Furthermore, we find that the court properly found clear and convincing evidence for termination under section 2511(b).[17]  Due to the severity of the trauma that Children experienced as a result of their sexual aggression towards one another, their therapists recommended that Children cease visits with Parents and their siblings until the parties made sufficient progress for contact to resume.  Due to Parents' failure to successfully engage in protective parenting treatment, this progress was never realized, and Children have not seen Parents since December of 2016.  At the time of the termination hearing, M.C.M. had spent years living with his maternal grandparents, who have completed protective parenting training and have been consistently willing to be a permanent, adoptive resource for him.  "The [c]ourt interviewed [M.C.M.], who expressed that he felt [okay] with not having contact with [Parents] and understood that he might not have sibling contact.  He explained [that Parents] did not take good care of him and his siblings.  They did not

_____

[17] **See** 23 Pa.C.S. § 2511(b) (in terminating the rights of a parent, court shall give primary consideration to developmental, physical, and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors . . . found to be beyond the control of the parent); **see also In re K.S.Z.**, 948 A.2d 753, 760 (Pa. Super. 2008) ("Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child.  The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.").  The determination of a child's "needs and welfare" requires an examination of "the status of the natural parental bond."  **In re E.M.**, 620 A.2d 481, 485 (Pa. 1993).  However, "in cases where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists."  **In re K.Z.S.**, **supra**, at 762-63.  As such, "the extent of any bond analysis . . . necessarily depends on the circumstances of the particular case."  **Id.** at 763.

provide much food and [abused him physically]."  Final Decree, 1/13/20, at n.1; *see also* N.T. Termination Hearing, 11/22/19, at 4.  S.P.M., Jr.'s therapist confirmed that S.P.M., Jr., did not have a healthy bond with Parents, and that terminating their parental rights would serve his best interests by facilitating his adoption and allowing him to forge new, healthier relationships with people.  *See In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006) ("The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.").

Based on the foregoing, we conclude the trial court did not commit an error of law or an abuse of discretion.  *In re T.S.M.*, *supra*.  Therefore, we affirm the court's decrees terminating Parents' parental rights to Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/24/20